UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAYNE EARL LaFOUNTAIN,

        Petitioner,               Case No. 1:09-cv-826

v.                                     Honorable Robert J. Jonker

ERIC BALCARCEL,

        Respondent.
_____/

## OPINION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Factual Allegations**

Petitioner Wayne Earl LaFountain presently is incarcerated at the Pine River Correctional Facility, though the actions he complains of occurred while he was housed at the Muskegon Correctional Facility (MCF). Petitioner is serving one term of 45 to 70 years and one term of 10 to 15 years, imposed by the Jackson County Circuit Court on September 5, 1984 and January 13, 1983, respectively, after Petitioner was convicted by separate juries of one count of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b, and one count of third-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d.

Petitioner, however, does not challenge his conviction or the imposition of his sentence. Instead, he challenges his convictions on multiple misconduct charges that resulted in the denial of 770 days of good time credits.[1] Petitioner alleges that he was denied his right to procedural due process when his good-time credits were denied based, at least in part, on a series of twelve misconducts for which he was denied various common-law defenses: selective prosecution, cruel and unusual punishment, duress and entrapment. Those misconducts all arose out of Petitioner's refusal to bunk with the other prisoner assigned to his cell. The misconducts were separately issued when he refused direct orders to return to his assigned cell on numerous occasions over a period of several days.

According to Petitioner, on September 28, 2007, he was transferred from the Lakeland Correctional Facility (LCF) to MCF. Petitioner objected to the transfer because he was

---

[1] A misconduct conviction results in the loss of good-time credits, which is equivalent to a loss of a "shortened prison sentence." *Wolff v. McDonnell*, 418 U.S. 539, 556-57 (1974). A challenge to a "shortened" prison sentence is a challenge to the fact or duration of confinement that is properly brought as an action for habeas corpus relief. *Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973). Because Petitioner's offense was committed before January 1, 1983, Petitioner is eligible to earn and be granted regular and special good-time credits. MICH. DEP'T OF CORR., Policy Directive 03.01.100.

pursuing a lawsuit against an MCF officer, Anthony Martin, and he feared further retaliation from Martin. *See LaFountain v. Anthony Martin*, No. 1:07-cv-76 (W.D. Mich.). Upon arrival at MCF, he demanded that he be placed in a lower bunk, asserting that he had a valid medical accommodation dated in 1996. The MCF officers determined that Petitioner did not have a valid medical accommodation and placed him in an upper bunk in a cell shared by Jimmy Riley. On October 2, 2007, Petitioner sent the MCF warden a written request for a cell change and filed a grievance. At that time, Petitioner stated that his demand for a cell change was based on the following: he was concerned about future retaliation from Martin; his transfer was retaliatory and the cell assignment was designed to cause a confrontation with the cellmate; he had a valid permanent bottom-bunk detail that was being ignored; and, finally, Riley made excessive noise and kept the lights on into the early morning hours, in violation of housing rules, causing Petitioner sleep deprivation and violating the Eighth Amendment.

On October 3, 2007, after four days of rooming with Riley, Petitioner refused to return to his cell during count, disobeying a direct order issued by Corrections Officer Hallowell. Hallowell issued a misconduct raising two charges: being out of place and disobeying a direct order. (App'x A to Pet., A-1, docket #1-2.) Petitioner requested a hearing. (*Id.*) Petitioner submitted a six-page statement in defense of the misconduct charge, in which he complained that (1) he had a valid bottom-bunk detail from 1996; (2) the transfer back to MCF and placement in the cell with Riley was retaliatory; and (3) on the preceding four nights he had been kept awake by Riley's paper shuffling and cell lights until 2:00 or 3:00 a.m., and he had received only three or four hours of sleep each night, in violation of the Eighth Amendment. Petitioner also requested numerous documents, including copies of a variety of prison policies, a copy of his special accommodation notice, copies

of his kite and statement sent to the warden, and copies of all cell-room move slips showing that other prisoners had been transferred out of Riley's cell. In addition, Petitioner submitted lengthy interrogatories and requests for admissions from various officers and prisoners. (*Id.* at A-2 to A-18.) The hearing investigator collected statements from several officers who indicated that Petitioner had asked for a cell move immediately upon arrival, before rooming with Riley. Resident Unit Manager Barbier stated that, when Petitioner complained about his cellmate typing until the early morning hours, Barbier questioned Riley, who claimed to type only until 10:00 p.m. Petitioner then told Barbier that he had a bottom-bunk detail, displaying paperwork from the 1990s. Barbier checked with Health Care and determined that Petitioner did not have a valid bottom-bunk detail. (*Id.* at A-26.) Petitioner's health care accommodation history was produced for the hearing, which showed that Petitioner's 1996 bottom-bunk detail was lifted on December 11, 1998. (*Id.* at A-19.)

On October 7, 2007, an administrative hearing was held. The administrative law judge (ALJ) indicated that he had received the following materials: Petitioner's statement and request for documents and witnesses, the statements of various officers, the list of Petitioner's current accommodations, and Petitioner's kite seeking a room move. (*Id.* at A-27.) The ALJ asked Petitioner if Riley had ever threatened him or posed a threat to his personal safety. Petitioner denied any threatening behavior but argued that the sleep deprivation constituted an Eighth Amendment violation. The ALJ found that the fact that other prisoners had been transferred from Riley's cell was irrelevant to the proceeding. He therefore denied Petitioner's request for prisoner witnesses. The ALJ also found that Petitioner did not have a valid bottom-bunk detail and that Petitioner's claims of retaliatory transfer and the violation of his constitutional rights were beyond the scope of the proceeding. (*Id.*) The ALJ held that there existed only three defenses to a charge of disobeying a

direct order: (1) whether the prisoner could have physically complied; (2) whether he was under a conflicting order at the time; and (3) whether compliance with the order would have created a significant risk to the physical well being of the prisoner. (*Id.*) The ALJ found that Petitioner could have physically complied with the order, was under no conflicting orders, and compliance, "under prisoner's theory of defense, would not have created a significant risk to the physical well being of the prisoner . . . ." (*Id.*)

Petitioner sought rehearing, which was denied on December 18, 2007. (*Id.* at A-28.) Petitioner also attempted to seek judicial review in the state courts, but his application was rejected because he could not pay the filing fee. (App'x C to Pet., docket #1-5.)

Petitioner was placed in temporary segregation when he disobeyed Hallowell's order to return to his cell. Thereafter, Petitioner was ordered by various corrections officers to return to his cell on three occasions on October 4, 2007, two occasions on October 5, 2007, one occasion on October 6, 2007, one occasion on October 7, 2007, two occasions on October 9, 2007 and one occasion on October 10, 2007. (App'x B to Pet., B-23 to B-25, B-32 to B-33, B-41, B-48, B-57, B-68, B-78.) Petitioner received hearings on all of the misconduct charges between October 4 and October 10, 2007. (App'x B to Pet., B-26, B-34, B-42, B-49, B-58, B-69, B-79.) At each of those hearings, the ALJs considered Petitioner's statements, the evidence from the various officers, the cell usage history, the list of Petitioner's current accommodations, and Petitioner's kite requesting a room move.[2] Beginning with his second hearing, Petitioner also argued that he did not have to comply

---

[2]The ALJ at the first hearing, which addressed two misconduct charges, was D. J. Pallas. (App'x A to Pet., A-26.) Pallas presided over four additional misconduct hearings involving seven misconduct charges, all of which were held on October 11, 2007. (App'x B. to Pet., B-26, B-34, B-42, B-49.) ALJ Jackson presided over the remaining three misconduct hearings involving three charges, all of which were heard on October 30, 2007. (App'x B to Pet., B-58, B-69, B-79.)

with the orders to leave temporary segregation because he was on non-bond status and therefore had an order to stay where he was. ALJ Pallas rejected that argument, stating the non-bond status was a status, not an order, and was not a defense to a charge of disobeying a direct order. (App'x B to Pet., B-26, B-34, B-42, B-49.)

Also beginning with the second misconduct hearing, Petitioner added a claim that Riley had indirectly threatened him in an argument. Both ALJ's rejected the argument as not credible, concluding that, had the claim of a threat been true, Petitioner would have brought it up as a defense at his first hearing. Indeed, ALJ Pallas noted in each of his subsequent decisions that he had asked Petitioner at the first hearing about whether Riley had threatened him, and Petitioner had denied threats. (App'x B to Pet., B-26, B-34, B-42, B-49.) Moreover, ALJ Pallas found that, because Petitioner had no evidence that Riley had ever been violent or threatened a roommate, Petitioner's request for witnesses about Riley's other bizarre behavior were not relevant to the proceeding. (*Id.*)

Petitioner sought rehearing after each of his misconduct determinations, all of which were denied. (App'x B to Pet., B-27, B-35, B-43, B-50, B-59, B-70, B-80.) He then attempted to obtain state-court review of the misconduct convictions, but his petitions for judicial review were rejected because he could not pay the state-court filing fees. (App'x B to Pet., B-29, B-38, B-45, B-54, B-65, B-75, B-85; App'x C to Pet., C-1 to C-16.)

On habeas review, Petitioner raises three grounds for relief, though they are numbered Grounds I, III, and IV:

> I. PETITIONER WAS DENIED FOURTEENTH AMENDMENT, DUE PROCESS OF LAW DUE TO THE FACIALLY AND AS-APPLIED OVERBREADTH OF PRISON POLICY AND PRACTICE WHICH

DISALLOWED AND OMITTED PETITIONER'S FACTS IN SUPPORT OF THE ASSERTED DEFENSE OF ENTRAPMENT, DURESS OR NECESSITY.

III. THE ADMINISTRATIVE CONVICTION IS CONSTITUTIONALLY VOID AND MUST BE VACATED DUE TO (a) AN UNFAIR AND BIASED, PRE-HEARING INVESTIGATION, (b) THE DENIAL OF PETITIONER'S STATUTORY AND CONSTITUTIONAL ENTITLEMENT TO BE HEARD AS TO EXCULPATORY EVIDENCE.

IV. PETITIONER WAS DENIED FOURTEENTH AMENDMENT DUE PROCESS OF LAW DUE TO THE PRISON PRACTICE AND CUSTOM OF OMITTING ALL OF PETITIONER'S WITNESSES AND DOCUMENTARY EVIDENCE IN FAVOR OF PRE-DETERMINING AND GRANTING THE INFALLIBLE CREDIBILITY TO PRISON CORRECTIONS EMPLOYEES.

(Pet., 6, 9, 10, docket #1.)

## Discussion

I. Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411;

*accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.[3]

---

[3] The Court observes that Petitioner has not exhausted his state-court remedies as ordinarily required before seeking federal habeas review. *See* 28 U.S.C. § 2254(b)(1)(A). However, because Petitioner was not permitted to file his petition for judicial review on the grounds of his indigence, he arguably is excused from the exhaustion requirement because "there is an absence of available state corrective process," 28 U.S.C. § 2254(b)(1)(B)(i), or because "circumstances exist that render such process ineffective to protect the rights of the applicant," 28 U.S.C. § 2254(b)(1)(B)(ii). The Court need not decide the issue, however, because the Court at all times retains the authority to deny a petition without first requiring exhaustion. 28 U.S.C. § 2254(b)(2).

II. Due Process

Petitioner contends that he was deprived of his right to procedural due process in the various misconduct hearings, ultimately resulting in misconduct convictions that affected the warden's decision to deny Petitioner 770 potential days of good-time. In his three grounds for relief, Petitioner contends he was denied due process in three ways: (1) he was denied certain common-law defenses; (2) the hearing officer relied on a biased investigation and refused to consider "exculpatory" evidence; and (3) the hearing officer excluded all of Petitioner's witnesses and evidence.

The starting point for any discussion of the procedural due process rights of a prisoner subject to a disciplinary proceeding is *Wolff v. McDonnell,* 418 U.S. 539 (1974). In *Wolff*, the Supreme Court recognized that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556. The Court held that a prison disciplinary proceeding meets due process requirements by (i) giving inmates advance written notice of charges at least 24 hours prior to the disciplinary hearing; (ii) allowing the inmate to call witnesses and present documentary evidence in the inmate's defense; and (iii) providing the inmate with a written statement of evidence relied on by the disciplinary board and the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563-69. The right to call witnesses or present evidence, however, is not absolute. *Id.* at 566. The United States Supreme Court explained:

> [W]e must balance the inmate's interest[s] against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary

evidence. Although we do not prescribe it, it would be useful for the Committee to state its reasons for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases.

*Id.*

"[N]ot much evidence is required to support the action of a prison disciplinary board." *Williams v. Bass,* 63 F.3d 483, 486 (6th Cir. 1995) (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985)). In *Hill*, the Supreme Court held that the requirements of due process are satisfied if "some evidence" supports the prison disciplinary board's decision to revoke good-time credits. *Hill*, 472 U.S. at 455. In determining whether a decision of a prison disciplinary board is supported by "some evidence," a federal court is "not required to examine the entire record, make an independent assessment of the credibility of witnesses, or weigh the evidence." *Williams,* 63 F.3d at 486 (citing *Hill,* 472 U.S. at 455). "Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board." *Williams,* 63 F.3d at 486 (citing *Hill,* 472 U.S. at 455-56) (emphasis added). Moreover, the Constitution does not require that the evidence logically preclude any conclusion but the one reached by the hearings officer in the disciplinary proceeding. *Hill,* 472 U.S. at 456; *see also Falkiewicz v. Grayson,* 271 F. Supp. 2d 942, 948 (E.D. Mich. 2003), *aff'd*, 110 F. App'x 491 (6th Cir. 2004). A hearings officer in a prison disciplinary proceeding is not required to find the prisoner guilty beyond a reasonable doubt, or find that guilty was the only reasonable interpretation of the evidence. *Thomas v. Marberry,* No. 06-cv-13282, 2007 WL 1041250, at *2 (E.D. Mich. Apr. 4, 2007) (citing *Mullins v. Smith,* 14 F. Supp. 2d 1009, 1012 (E.D. Mich. 1998)). Further, "this court will not interfere with the discretion of prison authorities to define offenses under their internal rules and to

assign offenses in particular cases." *Falkiewicz,* 271 F. Supp. 2d at 948 (citing *Turney v. Scroggy,* 831 F.2d 135, 139-40 (6th Cir. 1987)).

No question exists that the MDOC satisfied the first and third due-process requirements of *Wolff*. Petitioner does not dispute that he was given written notice of the charges against him at least 24 hours before each hearing. In addition, Petitioner has attached copies of the written decisions from each of the misconduct hearings, all of which thoroughly discuss the evidence relied upon by the hearing officers and the reasons for the decisions. Instead, each of Petitioner's habeas claims goes to the second due process requirement set forth in *Wolff* – the adequacy of Petitioner's opportunities to call witnesses and present evidence in his defense.

### A. Right to Common-Law Defenses

Petitioner asserts that the Due Process Clause requires that a prisoner be permitted to raise the common-law defenses of selective enforcement, entrapment, duress and necessity. He contends that the procedures governing prison disciplinary proceedings are overbroad, both facially and as applied to him, because they do not expressly permit those defenses.

Petitioner fails to cite any authority, much less Supreme Court authority, for his assertion that the Due Process Clause requires a state to recognize the common-law defenses of selective enforcement, entrapment, duress or necessity in prison disciplinary hearings. Nor is this Court aware of any such authority. As a result, Petitioner fails to demonstrate that he was denied any constitutional right by the existence of a prison policy that does not expressly permit those defenses. The policy therefore was not facially defective, and the observance of the policy by the ALJs was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. 2254(d).

Moreover, regardless of whether a duress or necessity defense was expressly permitted by the policy, Petitioner received a hearing at which his defenses were heard, though they ultimately were rejected. In applying the policy in each of the prison disciplinary hearings, the hearings officers expressly acknowledged that a prisoner may defend a charge of refusing to obey a direct order on the ground that compliance was not physically possible or because compliance "would have created a significant risk to the physical well being of the prisoner." (*See* App'x A to Pet., A-27; App'x B to Pet., B-26, B-34, B-42, B-49, B-58, B-69, B-79.) Such a defense essentially constitutes a duress or necessity defense. Further, Petitioner argued the defense and it was considered by both ALJs. In the hearings on his misconduct charges, Petitioner argued that he was compelled to ignore the direct orders to return to his cell because rooming with Riley caused him a constitutional level of injury from sleep deprivation. (*Id.*) The ALJs expressly considered the defense, though they concluded that the potential risk to Petitioner was not sufficient to excuse Petitioner's compliance with the order.

The mere fact that the ALJs did not agree with Petitioner that rooming with Riley created a significant risk to Petitioner's physical well being does not demonstrate that Petitioner was barred from raising his claim of "duress" as a defense to the misconduct charge. The Due Process Clause does not guarantee that a prison disciplinary procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an

Moreover, regardless of whether a duress or necessity defense was expressly permitted by the policy, Petitioner received a hearing at which his defenses were heard, though they ultimately were rejected. In applying the policy in each of the prison disciplinary hearings, the hearings officers expressly acknowledged that a prisoner may defend a charge of refusing to obey a direct order on the ground that compliance was not physically possible or because compliance "would have created a significant risk to the physical well being of the prisoner." (*See* App'x A to Pet., A-27; App'x B to Pet., B-26, B-34, B-42, B-49, B-58, B-69, B-79.) Such a defense essentially constitutes a duress or necessity defense. Further, Petitioner argued the defense and it was considered by both ALJs. In the hearings on his misconduct charges, Petitioner argued that he was compelled to ignore the direct orders to return to his cell because rooming with Riley caused him a constitutional level of injury from sleep deprivation. (*Id.*) The ALJs expressly considered the defense, though they concluded that the potential risk to Petitioner was not sufficient to excuse Petitioner's compliance with the order.

The mere fact that the ALJs did not agree with Petitioner that rooming with Riley created a significant risk to Petitioner's physical well being does not demonstrate that Petitioner was barred from raising his claim of "duress" as a defense to the misconduct charge. The Due Process Clause does not guarantee that a prison disciplinary procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an

interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). Petitioner's claim of duress was heard by the ALJs in a hearing that met the *Wolff* requirements. Moreover, their factual findings are entitled to a presumption of correctness, and Petitioner has not met his burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Petitioner's basis for an entrapment defense is vague. He appears to argue that MCF officials intentionally placed him in the cell with Riley, setting Petitioner up for a conflict with Riley and knowing that Petitioner would need to disobey orders in order to avoid the conflict. Again, Petitioner fails to identify any Supreme Court authority entitling him to an entrapment defense. Moreover, Petitioner did not allege that Riley had threatened or initiated threatening behavior until after his initial explanation for his disobedience had been rejected. The ALJs reasonably found that Petitioner's belated claim was not credible. Further, the potential conflict Petitioner alludes to appears to be his own potential to initiate a conflict with Riley. No basis exists for concluding that a prisoner's inability to control his own behavior, regardless of perceived provocation, is sufficient to amount to entrapment by prison officials.

Finally, Petitioner argues that he was denied due process when his "selective prosecution" defense was deemed beyond the scope of the misconduct proceeding. Petitioner argued that he was transferred to MCF and placed in a cell with Riley in retaliation for his pending civil rights action against an MCF employee, Anthony Martin. He suggests that he was "selectively prosecuted" because his disobedience was set up by MCF officers for retaliatory purposes. He also argues that he was given twelve misconducts for the same conduct in a coordinated plan to issue new and repeated orders to return to his cell over the course of several days.

Regardless of whether Petitioner was transferred to MCF and placed in a cell with Riley, his retaliation claim was, as the ALJ reasonably found, beyond the scope of the misconduct hearing. The federal courts have recognized that a false misconduct ticket that is itself motivated by a desire to retaliate for the exercise of constitutional rights may be actionable. *See, e.g., Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc) (retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution). Petitioner, however, has never alleged that the misconducts brought against him were false. Indeed, he has acknowledged that he refused to obey multiple orders to return to his cell. As a result, his argument appears to rest on the assumption that, if he was placed in the cell for retaliatory reasons, even if the placement did not result in his being subjected to unconstitutional conditions, he was entitled to demand transfer to a different cell and, when transfer was not granted within a few days, to disobey orders to return to his cell. The Court is aware of no constitutional authority, much less Supreme Court authority, that would support Petitioner's proposition. The ALJ considered whether Petitioner was placed at significant risk to his personal well being by obeying the order, but concluded that he was not. That conclusion was amply supported by the record evidence and is presumptively correct. Petitioner's remedy for an allegedly retaliatory transfer and cell-placement was to file a grievance and, if not satisfied by that process, to file a civil rights action in the federal court. The federal Constitution does not empower him to disobey a direct order with impunity. The Constitution also does not require that officials issue only one order to a prisoner to return to his cell. To conclude otherwise would be to accept the proposition that, once a prisoner has been issued a misconduct for failing to return to his cell, the prison must accommodate his wishes for a cell-transfer or keep him in

temporary segregation indefinitely without attempting to get him to comply. The Due Process Clause does not create such a ludicrous straightjacket for prison officials.

For all these reasons, Petitioner's first due process claim is rejected.

### B. Biased Investigation

In his second ground for habeas relief, Petitioner asserts that he was denied his opportunity to be heard on exculpatory evidence when the ALJ rejected his request to call witnesses for his defense who could testify about Riley's bizarre behavior and about other cellmates who had received transfers. Petitioner also argues that the hearings investigator was biased, taking statements only from officers and failing to submit certain questions to the charging officers and refused to question other prisoners about Riley's unusual behavior.

There is no due process requirement that a hearings investigator must conduct his investigation in a certain way. *See Falkiewicz,* 271 F. Supp. 2d at 948. Here, the investigators did not ignore Petitioner's statement of the facts. Instead, they investigated the accuracy of many of Petitioner's representations: (1) whether he had a valid bottom-bunk detail; (2) whether Riley typed all night as Petitioner represented; and (3) whether Petitioner's demand to be moved was triggered by his cellmate's conduct or whether it was initiated prior to problems with Riley. (*See* App'x A to Pet. at A-26.) The investigation of Petitioner's claims was more than adequate to support due process.

### C. Denial of Witnesses and Bias of decision maker

Petitioner asserts that the ALJs who presided over his misconduct hearings demonstrated that they were biased against him by observing the prison practice and custom of

omitting all of Petitioner's witnesses and documentary evidence and crediting the credibility of all corrections employees.

Petitioner's claim that he was denied the opportunity to present evidence at the hearings lack merit. Petitioner presented lengthy statements in response to each charge against him. He also was permitted to make oral representations at the hearing.

"Prisoners do not have an absolute, unfettered right to present evidence at misconduct hearings." *Falkiewicz,* 271 F. Supp. 2d at 948. Although Petitioner was not allowed to present witness testimony about his cellmate's bizarre behavior, he unquestionably received the opportunity to defend himself against the misconduct charges against him. Moreover, the hearing officers at each of the misconduct hearings reasonably determined that the testimony of other prisoners about Riley's bizarre behavior was irrelevant unless the testimony could demonstrate that Riley presented a threat to Petitioner. As previously discussed, when he was asked at the first hearing whether Riley had ever threatening him or posed a threat to his personal safety, Petitioner denied any threats. Instead, he claimed that Riley's late-night typing disturbed his sleep. Petitioner did not allege that Riley threatened him until after the first hearing officer rejected Petitioner's claim that interference with Petitioner's sleep constituted a significant threat to Petitioner's physical safety. Petitioner had not been in the cell with Riley since the day he first refused to return to his cell. The subsequent hearing officers reasonably concluded that Petitioner's later allegations were not credible. Further, Petitioner at no time suggested that other witnesses would provide evidence of a threat to his personal safety. Instead, he argued only that the witnesses could show that Riley was "mentally deranged" and that other prisoners had been transferred from Riley's cell. Because the witnesses could not testify that

Riley was dangerous or threatening, evidence about his other behavior was not relevant to the issue of whether Petitioner was required to obey a direct order.

Moreover, no evidence exists that bias caused the ALJs to discredit Petitioner's claims. Indeed, the record clearly demonstrates that the ALJs considered and rationally addressed Petitioner's claims about Riley's conduct, Petitioner's cell conditions, and Petitioner's credibility regarding his reasons for refusing to return to his cell. Petitioner's claim of bias appears to rest on the simple fact that the ALJs did not agree with Petitioner's arguments about why he was permitted to ignore direct orders.

As the Court has fully discussed, Petitioner received notice, an opportunity to be heard, and written explanations for each of the misconduct decisions, as required by *Wolff*. Once a court has decided that the procedural due process requirements of *Wolff* have been met, it must determine only whether there is "some evidence" which supports the decision of the prison disciplinary officer or board. *See Hill,* 472 U.S. at 455. There unquestionably existed ample evidence supporting the twelve findings of misconduct. Indeed, Petitioner does not contest that he disobeyed the order. Instead, he contends that he should not have been required to return to the cell because of Riley's behavior. The hearing officers' repeated conclusions that Petitioner would not have been placed at substantial risk by compliance was fully supported by Petitioner's own statements. Based upon the foregoing, I conclude that Petitioner's claims that he was denied procedural due process are without merit.

## **Conclusion**

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of the State of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated:    October 22, 2009              /s/ Robert J. Jonker
                                        ROBERT J. JONKER
                                        UNITED STATES DISTRICT JUDGE